DECISION AND JUDGMENT ENTRY
This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, Juvenile Division which terminated appellant's parental rights to her three children. Because we conclude that the trial court properly determined custody, we affirm.
Appellant, Dorcas L., is the natural mother of three children, Tiffany B. (born September 10, 1987), Maurice L. (born October 1, 1988), and Laqualynn B. (born June 26, 1991). On January 22, 1999, Lucas County Children Services ("LCCS") filed a complaint for temporary emergency custody and permanent custody of the three children, alleging that appellant had failed to seek psychiatric services and medications for Maurice; that the children had not attended school since the end of October 1998; that the children "reported" that they had no food and moved from place to place; that appellant had been "drinking excessively and using illegal drugs;" that appellant had been arrested on January 22, 1999 and was in jail; that Laqualynn's father was an alcoholic and the other two children's fathers were incarcerated and had no contact with the children. LCCS also alleged that it could not work with appellant who allegedly threatened to "blow up" the caseworker and the LCCS building and to "kill police" if they came to take away her children. At the initial hearing in January 1999, the juvenile court issued a no contact order between appellant and her children which continued up through April 1999.
On April 19, 20, and 28, the juvenile court conducted adjudication and disposition hearings. At adjudication, LCCS presented the following witnesses and evidence.
Robin Saldivar, a therapist at an in-patient psychiatric hospital, testified to Maurice's treatment there from October 1997 to April 1998. When Maurice was discharged from their program, it was recommended that he continue receiving psychiatric therapy and take at least six different medications to control his behavior. Saldivar had no contact or knowledge of Maurice's condition after he left that program in April 1998.
Sue Smith, the head teacher at the Kobacker Center, a school for severe behaviorally handicapped students, also testified. According to Smith, Maurice attended Kobacker in the fall of 1997 while previously in the temporary custody of LCCS. Smith testified that a couple weeks after Maurice was returned to appellant's custody, the school ran out of his medications and appellant failed to send in any more. Smith stated that while on the drugs, Maurice was more "directable." Maurice attended Kobacker for the remainder of the school year and was then enrolled in the summer school program for which transportation was provided. However, he attended only three days during the summer and did not return to the school until September 1998. Once returned, he then remained in school until October 30, 1998.
Smith further testified that Maurice was returned to Kobacker in February 1999, after LCCS regained custody. Although Maurice was put back on his medications, he remains at "Level One" behavior. According to Smith, Maurice is still "verbally abusive," threatens staff and other students with extremely violent acts, leaves the classroom to wander throughout the building, hits other people, and is generally disruptive.
Sherry Dunn, LCCS caseworker, testified that she had been involved with the family since April 1996. The three children had been previously placed in temporary custody of LCCS due to Maurice's behavior and allegations of sexual abuse to the girls. Following agency intervention and services provided, the two girls were soon returned to appellant. In April 1998, despite opposition by his therapist, LCCS, and the guardian adlitem, the juvenile court ordered Maurice's discharge from his placement in the psychiatric program and returned custody of him to appellant. No protective supervision was ordered. Appellant was expected to continue Maurice's therapy with a psychiatrist as well as keep him on his medications.
When Kobacker reported to the agency that Maurice was not attending the summer session, Dunn made an unofficial home visit. Appellant spoke with the caseworker, but refused to let her see the children. Ultimately, appellant agreed to meet with her at a McDonald's restaurant, to allow the caseworker to say good-bye to the children. Dunn then closed the case in July 1998.
In September, Dunn responded to a referral made to the agency about Maurice and again went to appellant's home. Appellant admitted that she had gradually taken Maurice off his medications because it made him sleep too much; she said she wanted him to be more like a "normal boy." However, appellant agreed to take Maurice for a psychiatric assessment at Connecting Point, a local mental health program. During this time, appellant indicated to Dunn that she was having problems with her housing and that she was getting frustrated with Maurice's behavior. After an incident in which Maurice allegedly injured a child related to appellant's boyfriend, appellant called Dunn. Appellant said she could not deal with Maurice anymore and for LCCS to come and get him. However, Dunn refused, stating that appellant must deal with him and engage in the recommended services.
Appellant then expressed a desire to leave the area. Dunn initially arranged for appellant to move to a shelter in Dayton, Ohio, where appellant's sister lived. However, appellant instead decided to move to Chicago to live with her boyfriend's family; she left with the three children in early November 1998. Dunn said that she then had appellant's ADC and SSI payments cut off so as to be able to locate appellant. Appellant called several times a week and Dunn was able to trace her location. Dunn then called the Chicago Department of Human Services to request a check on appellant and the children. The Chicago DHS investigated the family, but found no issues of concern.
After approximately two weeks, appellant called Dunn and said she wanted to return to Toledo. However, Dunn advised her that if she were to return, LCCS would likely file for permanent custody since appellant would not accept the agency's recommendations for Maurice. Dunn acknowledged telling appellant that if she did not want that to happen, appellant's "best bet" was to "go somewhere else." At this point, appellant became angry and, according to Dunn, threatened to "blow up" the caseworker and LCCS, and to "kill police" if they came to take her children away.
Dunn reported this threat to LCCS security and the local police. Sometime after Thanksgiving, appellant, who had by this time lost her local housing, returned to Lucas County, but did not notify LCCS. On January 22, Dunn said the boyfriend's mother called her to report that appellant and her boyfriend were fighting and appellant, who was "out of control" had broken a glass table. Consequently, appellant was arrested regarding this incident and LCCS was called to assume emergency custody of the three children.
Dunn stated that during the agency check-in procedures, the clinic expressed concern about the children's poor hygiene: the children and their clothing were very "dirty" and "smelly." According to Dunn, Maurice had dental problems and did not have his glasses, and the two girls also allegedly needed glasses. However, Dunn acknowledged that the children had no bruises or other signs of physical mistreatment and were not malnourished.
In addition, Dunn said that appellant had not yet acquired new housing since her return. However, Dunn acknowledged that no services were offered to appellant following the complaint for permanent custody and no attempt was made to help appellant with housing upon her return from Chicago. Dunn stated that she also had "concerns that appellant had substance abuse" problems; however, appellant denied such problems and refused to complete a substance abuse assessment, stating that Maurice's behavior was causing the problems. Dunn also testified that appellant currently had not visited the children due to the no contact order. Dunn, nevertheless, admitted that during the previous case, appellant had always visited with her children when permitted.
The criminal records of Tiffany's and Maurice's fathers, who were incarcerated, were admitted. The principal of the local elementary school corroborated that the two girls had not been enrolled in the Toledo public schools between October 30, 1998 and February 2, 1999. Appellant offered no witnesses in defense during adjudication.
After closing arguments, the juvenile court found all three children dependent and neglected. After a brief recess, the court proceeded with the disposition hearing. Sherry Dunn again testified that during the 1996 to 1998 custody proceedings, LCCS provided services including counseling, substance abuse assessment, and parenting classes. Upon appellant's successful completion of those services, the juvenile court had returned all three children to appellant's custody by April 1998.
Dunn then stated that since the goal in the current proceeding was permanent custody and LCCS had determined not to work with the family, no services were offered to appellant. Dunn noted that it was the agency's goal now to take permanent custody only of Tiffany and Maurice. Services had been provided to Laqualynn's father so that she could be placed in his custody.[1] She reiterated that due to the no contact order, appellant had been unable to visit her children.
Dunn opined that the severity of Maurice's problems and need for on-going psychiatric therapy meant that he would probably remain institutionalized for some time and was not likely to be adopted. Nevertheless, since appellant could not handle Maurice's problems and would not keep him on medication, she and the GAL recommended that permanent custody be granted. Dunn and the GAL also recommended permanent custody be granted as to Tiffany and temporary custody as to Laqualynn, because they had been neglected and exposed to the behavior and neglect of Maurice. The juvenile court then indicated it would take judicial notice of the adjudicatory testimony and facts as it applied to disposition.
The girls' attorney then called appellant's cousin, a single mother of three children, on behalf of the girls and appellant. The cousin testified that appellant had been living with her since returning from Chicago. She stated that she was assisting appellant to find employment and housing. In the meantime, her four bedroom home was large enough for appellant and her children to stay with her, should custody be returned to appellant.
Counsel for Maurice stated that Maurice wished to return home. Maurice's counsel requested that the court not grant permanent custody, since it was unlikely that Maurice would ever be adopted. Counsel then suggested that if the court did not want to return custody to appellant, that long-term foster care presented the best alternative to permit Maurice a continuing relationship with his mother and siblings.
Counsel for the two girls noted that Laqualynn had chosen to be placed with her father, since being removed from her mother. Tiffany, however, wanted to be returned to appellant, which the court confirmed in an in camera interview with Tiffany.
The juvenile court ultimately awarded permanent custody of Tiffany and Maurice and temporary custody of Laqualynn to LCCS. The court found that LCCS "made reasonable efforts to prevent the removal of the children from their home, or to eliminate the need for continued removal from the home, but such efforts were unsuccessful." The court further found that LCCS "offered services to [appellant] and her family from 1995 to present in an effort to rehabilitate them."
The court then found that "following placement of the children outside the children's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the children to be placed outside their home, all of the parents have failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the children's home." The court concluded that appellant "caused or allowed the children to suffer neglect as described in 2151.03 of the Revised Code" and" the seriousness, nature or likelihood of recurrence of the neglect make the children's placement with [appellant] a threat to the children's safety."
Finally, the court found that appellant "is unwilling to provide food, clothing, shelter, and other basic necessities for the children an is unwilling to prevent Maurice from suffering physical, emotional or mental neglect;" and that appellant "demonstrated a lack of commitment towards her children by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; "specifically as to [appellant], the court finds that her refusal to cooperate with services and evasion of the L.C.C.S. caseworker demonstrate a lack of commitment towards the children."
Appellant, now appeals that decision, setting forth the following five assignments[2] of error:
 "I. The Trial Court erred in failing to conduct permanent custody proceedings in bifurcated stages and failed to follow Juvenile Rule 29(D)in particular.
 "II. The Trial Court erred in not complying with ORC section 2151.419.
 "III. The Trial Court erred in not complying with ORC section 2151.414(A)(1) and in allowing testimony that should have been barred by Res Judicata.
 "IV. The Trial Court's judgment as to the existence of the conditions set forth in ORC sections 2151.414(B) 
(E)(1) is not supported by clear and convincing evidence.
 "V. Appellant Dorcas L. [sic] was prejudiced because her attorney did not provide effective assistance of counsel, thus depriving her of her rights under the Sixth and Fourteenth Amendments to the United States Constitution and sections 10 and 16, Article I of the Ohio Constitution, ORC section 2151.352 and Juvenile. [sic] Rule [sic] 4(A) and 29(B)."
 I.
Appellant, in her first assignment of error, argues that the trial court erred in accepting the consent to permanent custody by one of the children's fathers as indicated through his attorney.[3] That father, however, is not a party to this appeal.
An appealing party may complain of an error committed against a non-appealing party when the error is prejudicial to the rights of the appellant. In re Smith (1991), 77 Ohio App.3d 1,13.
In this case, the juvenile court indicated on the record that Maurice's father, who would remain incarcerated in Illinois for a significant period of time, had instructed his attorney to "not advocate for his position" in the custody proceedings. Therefore, Maurice's father waived any interest in the proceedings. Appellant and Maurice's father had not maintained any relationship or connection which would affect her parental rights. Therefore, we can discern no error prejudicial to appellant's rights which would give her standing to appeal this issue on behalf of Maurice's father.
Accordingly, appellant's first assignment of error is not well-taken.
 II.
Appellant, in her second assignment of error, contends that the juvenile court did not comply with the requirements of R.C. 2151.419 as to the agency's burden of proving it made reasonable efforts to prevent removal or to make it possible for the child to return home. Specifically, appellant argues that the judgment entry does not describe the relevant services offered or, in the alternative, find that offering such services would have been futile.
R.C. 2151.419(A)(1) requires that at any hearing pursuant to 2151.353 (to determine whether a child is dependent or neglected) where a juvenile court
 "continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible to the child to return safely home. * * *
"* * *
 "(B)(1) A court that is required to make a determination described in division (A)(1) or (2) of this section shall issue written findings of fact setting forth the reasons supporting its determination. If the court makes a written determination under (A)(1) of this section, it shall briefly describe in the findings of fact the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from the child's home or enable the child to return safely home."[4]
In this case, the trial court stated in its judgment entry that appellant was "offered extensive services which included counseling, parenting classes, psychiatric treatment for Maurice; assistance in obtaining housing; substance abuse assessment and treatment is recommended; psychological evaluation for [appellant]; as well as L.C.C.S. casework services." The court later found that appellant's "refusal to cooperate with services * * * demonstrate a lack of commitment towards the children."
We acknowledge that the court's judgment does not include a specific finding that offering services to appellant (after the filing of the permanent custody complaint) would have been futile. However, the facts included in the entry supports such a conclusion. Therefore, we cannot say that the trial court omitted the necessary findings of fact.
Accordingly, appellant's second assignment of error is not well-taken.
 III.
Appellant, in her third assignment of error, contends that the trial court improperly admitted testimony which was improperly admitted under R.C. 2151.414(A)(1) and res judicata. In particular, appellant challenges the admission of testimony by the caseworker who had previously testified during adjudication.
During a disposition hearing, R.C. 2151.35(B)(2)(b) states that the juvenile court may admit "any evidence that is material and relevant, including but not limited to, hearsay, opinion, and documentary evidence." See also R.C. 2151.414(E). In her contentions, appellant is apparently referring to the language in R.C. 2151.414(A)(1) which states, "The adjudication that the child is an abused, neglected, or dependent child and the grant of temporary custody to the agency that filed the motion * * * shall not be readjudicated at the hearing and shall not be affected by a denial of the motion for permanent custody." We read that passage to mean that the legislature did not intend to prevent the reiteration of certain testimony, as proposed by appellant. Rather, the language indicates that disposition proceedings, regardless of the outcome, would have no effect on initial adjudicatory determination.
In this case, while the testimony by the principal of the school had limited value, we cannot say it was so irrelevant to be inadmissible. Likewise, although some of the references made by the caseworker were not specific as to the source, the facts as to appellant's failure to follow through with Maurice's psychiatric care and medications are undisputed. Via the same testimony, appellant's motives for such failure were also presented, i.e., her dissatisfaction with the effects of the medication and her unwillingness to continue with Maurice's therapy. Therefore, we cannot say that the testimony was inadmissible pursuant to R.C. 2151.414(A).
Accordingly, appellant's third assignment of error is not well-taken.
 IV.
Appellant, in her fourth assignment of error, essentially argues that the juvenile court's judgment was against the manifest weight of the evidence as to the existence of the conditions set forth in R.C.2151.414(B) and (E)(1).
The custody hearing in this case was brought pursuant to an original complaint for permanent custody under R.C. 2151.353. Therefore, R.C. 2151.414(B), which applies to motions for permanent custody filed after an agency has already been granted temporary custody pursuant to adjudication and disposition under R.C.2151.353, does not apply in this case. We will now examine the record to determine whether the juvenile court's determination was supported by clear and convincing evidence as required under applicable sections R.C. 2151.414(D) and (E).
Pursuant to R.C. 2151.353(A)(4), if a child has been adjudicated neglected or dependent, a court may grant permanent custody to a public children services agency
 "if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child."
First, to determine the best interest of the child, the applicable version of R.C. 2151.414(D) provided that:
 "the court shall consider all relevant factors, including, but not limited to, * * *
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of a public children services agency * * * under one or more separate orders of disposition issued under 2151.353 or 2151.415 of the Revised Code for twelve or more months of a consecutive twenty-two month period ending on or after the effective date of this amendment;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency."
Second, to enter a finding that the child cannot be placed with his parents within a reasonable time or should not be placed with either parent, the court must find, by clear and convincing evidence, that only one of sixteen factors exists, including the following:
 "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
"* * *
 "(4) the parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
"* * *
 "(14) The parent for any reason is unwilling to * * * prevent the child from suffering physical, emotional, or mental neglect.
 "(15) The parent has * * * caused the child to suffer neglect as described in section 2151.03 of the Revised code, and the court determined that the seriousness, nature, or likelihood of recurrence of the * * * neglect makes the child's placement with the child's parent a threat to the child's safety.
"(16) Any other factor the court considers relevant."
Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief of conviction as to the allegations sought to be established."Cross v. Ledford (1954), 161 Ohio St. 469, 477.
In this case, the evidence on disposition centered mainly around appellant's failure to continue the medication prescribed for Maurice nearly one year prior to the complaint for permanent custody and adjudication. Although no expert medical evidence was presented as to Maurice's current needs for therapy or medication, it had been previously established that Maurice needed such medications and other mental health therapy. Under the facts and circumstances of this case, without medical testimony to support mother's actions in removing him from both medications and therapy, the prior diagnosis must be viewed as still valid.
Appellant also argues that evidence as to the two girls is inadmissible because it was "hearsay or outside the scope of the witness' personal knowledge." As we have noted previously, on disposition, hearsay and other relevant information is admissible. See R.C. 2151.35 and 2151.414(E). Appellant is essentially claiming that the caseworker's testimony did not establish that Maurice's behavior or medical neglect had any bearing upon custody issues involving the girls.
We agree that the evidence in the record concerning the two girls is less specific and less dramatic than that regarding Maurice. However, the children had not been enrolled in school and apparently had no permanent household. Their poor hygiene was severe enough to cause concern at the clinic when they were taken into custody and appellant had neglected the medical needs and mental health therapy of a sibling. Furthermore, appellant's out of control behavior and arrest at the boyfriend's mother's home along with her threats to the agency worker provided evidence that appellant has her own unaddressed violence issues.
Therefore, we conclude that the trial court's findings under R.C. 2151.414(E)(1), (14), and (15) were supported by clear and convincing evidence and the grant of permanent custody of Maurice and Tiffany and temporary custody of Laqualynn was not against the manifest weight of the evidence.
Accordingly, appellant's fourth assignment of error is not well-taken.
 V.
Finally, appellant, in her fifth assignment of error, claims that she was not afforded effective assistance of counsel.
In order to prove ineffective assistance of counsel, a defendant must show 1) that defense counsel's representation fell below an objective standard of reasonableness and 2) that counsel's deficient representation was prejudicial to defendant's case. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. See also Strickland v. Washington (1984),466 U.S. 668, 694.
In this case, appellant's claims of ineffective assistance of counsel essentially concern her counsel's failure to object to the admission of certain information. However, we have already determined that such testimony was either admissible or not prejudicial. Therefore, we conclude that the failure to object to the admission of such testimony did not fall below an objective standard of reasonableness and was not prejudicial to appellant's case.
Accordingly, appellant's fifth assignment of error is not well-taken.
The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Court costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
 __________________________ James R. Sherck, J., JUDGE
 Richard W. Knepper, P.J., Mark L. Pietrykowski, J.
CONCUR.
[1] The complaint alleges that Laqualynn's father is an alcoholic. Apparently, LCCS later determined this to be untrue and amended its complaint to seek only temporary custody of Laqualynn.
[2] We note that we are addressing the assignments of error as outlined and argued in the body of appellant's brief, which differ significantly in order and substance from those listed in the Table of Contents.
[3] In her first assignment of error, appellant also stated that the trial court failed "to conduct permanent custody proceedings in bifurcated stages." Appellant failed to put forth any argument as to this issue. Nonetheless, the record reveals that the trial court did break after adjudication and the proceeded with disposition, with the parties' agreement.
[4] The reasonableness of an agency's efforts may be discerned from the record and findings of the court. See In rePieper Children (1993), 85 Ohio App.3d 318.